FILED

2014 May-14  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| HAROLD LOCKHART, | ) | |
| GLENDA LOCKHART, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 5:12-cv-01023-TMP |
| | ) | |
| TONY VEST, individually, | ) | |
| KRISTEN BARNETT, individually, | ) | |
| CHAD SMITH, individually, | ) | |
| CHRIS DUTTON, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This action is before the court on a motion for partial summary judgment filed on July 15, 2013, by defendant Tony Vest ("Vest") (doc. 48), and motions for full summary judgment filed the same day by defendants Chad Smith ("Smith") (doc. 50), Kristen Barnett ("Barnett") (doc. 52), and Chris Dutton ("Dutton") (doc. 54). Vest seeks summary judgment on Harold Lockhart's claims of false arrest and false imprisonment and both Harold's and Glenda Lockhart's claims of malicious prosecution and "home invasion." Vest does not move for summary judgment on the claims against him by Glenda Lockhart for false arrest and false imprisonment, as disputes of material fact remain. Defendants Smith, Barnett, and Dutton seek summary judgment as to all claims raised against them: false arrest of Harold and

Glenda Lockhart; false imprisonment of Harold and Glenda Lockhart; and "home invasion." The motions have been fully briefed. The parties have not consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge. Accordingly, the undersigned enters this report and recommendation.

## I.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. V. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

2

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it

is so one-sided that one party must prevail as a matter of law." Id. at 251-252; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004). If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination. See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the

4

substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.   Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

The failure to respond to a motion for summary judgment is not enough, in itself, to justify granting summary judgment.   Indeed, Rule 56(a) instructs that the court shall grant summary judgment only "*if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a) (emphasis added).   Thus, a court "may neither grant nor deny summary judgment by default."   James Wm. Moore et al., Moore's Federal Practice, § 56.99[b] (3d ed. 1997).   As noted by the Advisory Committee, "summary judgment cannot be granted by default *even if there is a complete failure to respond to the motion*, much less when an attempted response fails to comply with Rule 56(c) requirements."   Fed. R. Civ. P. 56 advisory committee's note (emphasis added).   Because "the district court cannot base the entry of summary judgment on the mere fact that it is unopposed, it must consider the merits of the motion."   United States v. one Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004).   Utilizing these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

## II.    Facts for Summary Judgment Purposes[1]

Applying the summary judgment standards to the evidence before the court, the following facts are treated as undisputed and taken in the light most favorable to the non-moving plaintiffs.

On the night of July 29-30, 2011, Glenda, her grandchildren Bailey and Daniel Lockhart[2], Bailey's friend Lindsey, and family friends Felicia Cooper ("Felicia") and Jeff Hendricks ("Jeff"), were on the front porch of the Lockhart home, located at 2671 Highway 55 East, Falkville, Alabama.  Later in the evening, Glenda's son, Patrick Holloway ("Patrick"), and his wife, Charlotte, walked over from his home next door. Patrick asked to borrow Glenda's car so that he and Charlotte could get something to eat.  Based on her suspicion that Patrick and Charlotte had been drinking, Glenda refused.   Patrick picked up the Lockharts' shotgun, which was propped on the porch, and stated that he planned to "hold the gun hostage" until Glenda agreed to let him borrow her car.  Patrick and Charlotte returned to their home, taking the shotgun. Glenda instructed her grandson, Daniel, to wake Harold; then Glenda and Felicia walked to Patrick's home to retrieve the gun.

---

[1]   To the extent that the defendants move to strike the plaintiffs' statement of facts in the plaintiffs' response to the motion for summary judgment, that motion hereby is DENIED. (Doc. 77).

[2]   Bailey Lockhart was eleven or twelve years-old at the time of the incident (Bailey Lockhart, depo. at p. 21), and Daniel Lockhart was fourteen years-old (Daniel Lockhart, depo. at p. 24).

As instructed, Daniel woke Harold, telling him that Patrick was "acting up again" and that he had a gun.  Patrick had caused disturbances that required the Sheriff's Department to be called to the property before.   Harold instructed Daniel to call 911 and then walked to Patrick's home.   Meanwhile, a heated discussion took place between Patrick and Glenda on Patrick's lawn.   Harold arrived, and Patrick agreed to return the gun to Glenda.   To clear the gun's barrel, Glenda fired the gun into the air. She handed the gun to Harold and asked him to return it to their home.   Patrick went inside his home to go to bed, and Glenda, Harold, and Felicia returned to the Lockhart home.   During the confrontation, Daniel called 911, as instructed by Harold, and reported in a panicked voice that shots had been fired.   Bailey and Lindsey had remained at the Lockhart residence and, upon her return, Glenda instructed the girls to go upstairs.   Glenda and Felicia remained on the front porch of the house.   Glenda chastised Daniel for calling 911, not knowing that he had been instructed to do so, and Daniel, upset, went into the woods behind the home.   Jeff also went into the woods prior to the arrival of the police.

Harold placed the shotgun in the Lockharts' bedroom closet and went to the front gate of the property to meet the police.   Smith and Vest arrived at the Lockhart home shortly after midnight.   Upon the arrival of the first police cruisers, Harold told deputies Smith and Vest, "[t]hank you for coming, and you all have been here before. Patrick is acting up again, and he got his mom's shotgun, and we got it away from him.

He's gone to bed, and everything is fine."   (Harold Lockhart, Depo. at p. 50).   When Smith informed Harold that they need to investigate the call, Harold opened the gate and said "follow me."   Smith and Vest followed Harold in their cruisers and parked.[3] Harold testified that the defendants did not ask him whether shots were fired.   Harold told Smith and Vest that the incident occurred at Patrick's home and was over.   Smith and Vest told Harold that they needed to "look around anyway," and Harold replied, "ok."   Smith, upon discovering Bailey and Lindsey in the house, asked to speak with the girls and perform a welfare check inside the residence.   Although Harold stated that he would rather have the girls' parents present, he allowed Smith to enter the residence and question Bailey and Lindsey about what had transpired.   At some point during the questioning, Harold told the girls that they did not have to speak to Smith if they did not want to.   Smith told him to go sit on the couch, and Harold complied.   After some time, Harold went back out to the porch.   Vest and Smith testified that when Smith finished questioning the girls, they sent the girls upstairs and conducted a safety sweep upstairs to ensure the girls' safety.[4]

---

[3]   There is some discrepancy in testimony about in which driveway the cruisers were parked. However, it does not appear that where the vehicles were parked is a material fact.

[4]   The plaintiffs' response argues that "Deputy Smith admitted to searching the living room, bedroom, and kitchen without permission."   In support of this, plaintiffs cite defendant Smith's deposition testimony at page 41.   However, Smith's deposition does not support that assertion.   The following deposition testimony occurred at page 41:

Q.   And after you finished talking to the juvenile, did you ask him to go get
      the weapon?

After speaking with the girls, completing a safety check, and finding no sign of a struggle inside the Lockhart home, Smith and Vest returned to the porch, where Harold, Glenda, and Felicia were waiting.   Because Bailey and Lindsey mentioned that a gun was involved in the incident, Smith asked Harold where the gun was located. Harold retrieved the shotgun, and placed it on the front porch.[5]   Harold then asked the deputies if there was anything else they needed and why they were still at his home. Smith instructed Harold to stand at the end of the porch with Glenda and Felicia. Sometime previously, Barnett had arrived on the property and was standing with Vest

---

    A.  I never asked him to get the weapon.   We asked him where it was.
    Q.  And he told you were it was.
    A.  He said it was in the closet.
    Q.  Who got the weapon?
    A.  Mr. Lockhart lead -- it was Mr. Lockhart first, Deputy Vest second, and I
        was third.   Mr. Lockhart went toward the bedroom, towards where the closet was.

(Chad Smith, Depo. at 40-41).

This is hardly an admission to an illegal search.   Furthermore, Harold testified that when Smith told him that he wanted to talk to the girls inside to perform a safety check, Harold said, "Come in."   (Harold Lockhart, Depo. at 55).   Harold "took [the deputies] into the house" and called the girls downstairs. (Id.)   He told the defendants "they could search the house looking for weapons. . . . They chose not to. . . . On a safety check where weapons are involved, I invited them into the house, talked to the girls, and they could have gone any place they wanted to looking for weapons." (Id. at 124). The testimony from both Smith and Harold indicates that Smith actually had express permission to enter the house and search for weapons.   The plaintiff's bare assertion in argument does not create a dispute of material fact and, therefore, the court will use the fact asserted in the defendants' motion for summary judgment, which is consistent with the evidence in the record.

    [5]   There is a factual dispute as to whether any deputies went with Harold to retrieve the shotgun.   Harold testified that he went alone to the closet to retrieve the gun.   (Harold Lockhart, Depo. at 62).   However, Smith testified that he and Vest followed Harold to the closet (Chad Smith, Depo. at 40-41), and Vest testified that he went with Harold to retrieve the shotgun.   (Tony Vest, Depo. at 14).   In accordance with summary judgment standards, the non-moving plaintiff's version of events will be taken as true.

near the end of the porch, supervising Harold, Glenda, and Felicia.  The deputies

remained on the property and inside or near the home because Jeff and Daniel still were

unaccounted-for, and Vest had concerns about one of them returning through the

back-door of the home.[6]   Patrick also was unaccounted-for.[7]

Dutton arrived and Smith informed him that subjects still were missing in the

woods.   Dutton commenced a perimeter search of the backyard and woods and

attempted to make contact with Patrick.[8]   Felicia testified that while she, Glenda, and

Harold were on the porch, the defendants "kept asking us what happened.   And we

kept telling them there was an argument.   And they just wouldn't stop."   (Felicia

Cooper, Depo. at 60).   Eventually, Harold became frustrated with the continued

---

[6]   Although the plaintiffs' brief states that Vest remained *inside* the home due to the existence
of unaccounted-for parties (Tony Vest, Depo. at 25), Vest's deposition does not state that he remained
inside the home.   Vest's deposition explains his reasoning that, although Bailey and Lindsey appeared
unharmed, their safety was not firmly established because two other parties were unaccounted-for.
The plaintiffs' brief also claims that when Smith finished speaking with the girls and returned to the
porch, he told Harold to go stand "where Mrs. Lockhart and Ms. Cooper were being guarded by
Deputies Vest and Barnett."   (Doc. 66, p. 7).

[7]   The plaintiffs' brief cites Vest's deposition at page 35 to support the claim that "Deputies
Smith, Vest, Barnett, and Dutton (when he got there) continued to occupy the Lockhart residence,
using it as a command post."   (Doc. 66, p. 8).   Page 35 of Vest's deposition does not make any
mention of why, how long, or in what manner the defendants remained at the residence.   The only
comment to that effect is on page 33 where Vest states that the defendants would not leave the
residence when asked because they "were still conducting an investigation."   (Vest, Depo. at 33).

[8]   The plaintiffs' brief quotes Dutton as saying that he was "all over that place walking
around."   (Doc. 66, p. 8).   It is unclear whether the plaintiffs' brief uses the quote to try to prove that
Dutton was walking inside or outside the home.   The court determines that when Dutton made the
statement he was describing his perimeter search and, therefore, was walking the outside of the
property.   (Chris Dutton, Depo. at 14).

officer presence and stated: "This is ridiculous, it's gone on for too long.   I'm going to call an attorney."   Harold began to walk toward the front door of the home,[9] and Smith placed him under arrest for interference with a governmental operation.[10] Harold was placed in handcuffs, led to a patrol car, and placed in the back seat.   He remained in the patrol car for almost two hours.   While in the patrol car, Harold observed officer activity on the property, saw officers go into and out of the house several times, and saw lights turned on and off in the guest bedroom, upstairs, and in the garage.   He also observed flashlights in the wood line.   Officers finally made contact with Charlotte, and Harold observed officers speaking with her outside Patrick's home. Harold also saw an EMS ambulance park at Patrick's house.

After Harold's arrest, Daniel returned to the Lockhart home and was questioned by officers.   During questioning, the officers got Daniel something to drink and let him sit on the sofa.   When Daniel was sitting on the sofa, an officer was "standing by" inside the home.   (Daniel Lockhart, Depo. at 67-68).[11]   Daniel saw officers walking in

---

[9]   Harold testified that he took only one step, or maybe two, toward the front door.   (Harold Lockhart, Depo. at 69).   Smith, however, claimed that Harold walked past him to get to the front door.   (Chad Smith, Depo. at 55).

[10]   The plaintiffs' brief notes that Smith, in his deposition, said that he would not have arrested Harold if Harold simply had said "I'm not going to talk anymore," and remained in place.   (Doc. 66, p. 8).   However, this statement was a response to a hypothetical question, not a description of the events that actually occurred.   (Chad Smith, Depo. at 71).   Accordingly, it is mere inappropriate speculation to include in the statement of facts surrounding the events giving rise to this action.

[11]   The plaintiffs' brief quotes Daniel Lockhart as stating that police were walking around all over the house.   (Doc. 66, p. 8).   After Daniel found his sister and Lindsey upstairs with Felicia and

11

and out of the house, talking to each other, and states that he believed an officer was upstairs with Bailey, Lindsey, and Felicia.  (Daniel Lockhart, Depo. at 76-79).   He stated that he heard drawers open a couple of times.   (Daniel Lockhart, Depo. at 77). After Harold's arrest, Smith and Dutton unsuccessfully attempted to make contact with Patrick by knocking on the door.   While questioning Daniel, they had him call Patrick's residence.   When Daniel called the residence, Charlotte answered, and Smith and Dutton returned to Patrick's residence to speak with her.   Harold observed this encounter while sitting in the patrol car.

While the officers tried to make contact with Patrick, Glenda and Felicia were outside on the front porch.   Glenda saw Daniel walking around the perimeter of the woods several times before he actually returned to the Lockhart home.   Glenda remained on the front porch for an hour-and-a-half to two hours after Harold was arrested.   She states that, during that time, she saw approximately 8 deputies going into and out of her home and walking around the house.   At some point after Harold's arrest, Glenda asked to go to the restroom, but Barnett told her that if she got up she would be arrested and warned Glenda that she was about to arrest her for public intoxication.   Later, Felicia was given permission to go to the restroom.   She went inside the house and did not return to the front porch.   At some point after that, Vest

---

an officer, he heard "officers walking around all over the house."   (Daniel Lockhart, Depo. at 74). The plaintiffs cite a statement from Daniel at page 68 of his deposition saying officers were "walking around outside the house."   The deposition at the cited page does not include that statement.

placed Glenda under arrest.   Glenda was placed in a different car than Harold, and then Harold was brought to the car Glenda was in.   Before leaving for the jail, Vest escorted Glenda through the house to retrieve her identification and shoes.[12]   Glenda testified that, as Vest escorted her through the house, she saw "a deputy -- not [Smith, Barnett, or Dutton] -- that was going through our bookcase in the living room." (Glenda Lockhart, Depo. at 114).   Bailey, who was in the living room, asked if Glenda was being arrested too, and Smith commented, "I guess you're not going to the beach now, are you?"   After Glenda retrieved her shoes and identification, she and Harold were taken to the Morgan County Jail.

Bailey Lockhart testified that after she came back downstairs she witnessed Glenda being led through the house by Vest.   She also saw around six deputies inside the home, looking around.   She said they were searching through the books and the shelves in the library.   Two officers went upstairs and some went into the Lockharts' bedroom, the guest bedroom, and the bathroom.   Bailey testified that she heard drawers and cabinets opening in the Lockharts' bedroom and storage baskets being moved in the bathroom.   After Harold and Glenda had been arrested, the officers instructed the children to call their parents to come and get them.

---

[12]   The plaintiffs' brief states that both Vest and Barnett accompanied Glenda to retrieve her shoes and identification.   (Doc. 66, p. 11).   However, Glenda stated in her deposition that only Vest accompanied her.   (Glenda Lockhart, Depo. at 113).

At the conclusion of the investigation, while at Patrick's residence, an officer pointed out to Smith a spent shotgun-shell, the fore-grip of a shotgun, and a pair of eyeglasses lying on the ground.   The photograph of the shotgun-shell, taken as evidence, shows only a leaf.   The shotgun-shell was not collected as evidence.   Smith stated that he began the investigation at the Lockhart home because Harold Lockhart greeted him at the gate and he believed the 911 call came from the Lockhart home. After all of the witness statements were collected, the deputies determined that the altercation occurred at Patrick's home.[13]

Harold and Glenda were released on bond from the Morgan County Jail and taken home the next morning.   They arrived home at around 8:00 a.m.   The shotgun still was on the front porch, where it had been placed the night before.   Upon returning home, the Lockharts took pictures of their home to document evidence of the alleged search.   The pictures document open drawers in the upstairs "game room;" papers and pictures moved on Harold's open desk in the library; opened drawers on Glenda's nightstand; open drawers and cabinets in the bathroom; open drawers on Glenda's vanity; storage baskets pulled out; Glenda's open jewelry box; baskets pulled out in the

---

[13]   The plaintiffs' brief states that Vest "admitted" the incident occurred at Patrick's home. (Doc. 66, p. 7).   The brief implies that Vest made the "admission" around the time he performed the security check.   However, Vest's deposition actually states that the defendants determined that the altercation took place at Patrick's house after collecting all of the witness statements.   (Tony Vest, Depo. at 35).   The court will not enter this so-called "admission" as a fact, because the evidence does not support it.   The plaintiffs may not create disputes of material fact where none exist.

Lockharts' closet; clothes moved in the closet; and some of Glenda's underwear on the floor.   Digital copies of the pictures no longer exist, the memory card for the camera having been "overwritten" with new data.   (Harold Lockhart, Depo. at 86).   Hard copies, however, remain in evidence.


## III. Discussion

The plaintiff's Third Amended Complaint asserts four claims[14] relevant to the pending motion for partial summary judgment, summarized as follows:

> 1. **False Arrest** - Harold Lockhart and Glenda Lockhart allege under 42 U.S.C. § 1983 and the Fourth Amendment to the Constitution of the United States of America, that Tony Vest,[15] Kristen Barnett, Chad Smith, and Chris Dutton used the power of the state to unlawfully arrest, effectuate the unlawful arrest, or aid in the unlawful arrest of the plaintiffs;
>
> 2. **False Imprisonment** - Harold Lockhart and Glenda Lockhart allege   under 42 U.S.C. § 1983 and the Fourth Amendment to the Constitution of the United States of America, that Tony Vest, Kristen Barnett, Chad Smith, and Chris Dutton used the power of the state to effectuate the unlawful false imprisonment of the plaintiffs;

---

[14]   According to the plaintiffs' Third Amended Complaint, all of the plaintiffs' claims are brought under federal law pursuant to § 1983.   No state-law claims are alleged.   (Doc. 29, p. 2).

[15]   Tony Vest does not move for summary judgment for the alleged False Arrest and False Imprisonment of Glenda Lockhart.   He stipulates that there are disputes of material fact as to the events surrounding Glenda Lockhart's arrest.

3.   **Home Invasion** - Harold Lockhart and Glenda Lockhart allege under 42 U.S.C. § 1983 and the Fourth Amendment to the Constitution of the United States of America, that Tony Vest, Kristen Barnett, Chad Smith, and Chris Dutton used the power of the state to illegally enter and search the plaintiffs' home without a search warrant or exigent circumstances;

4.   **Malicious Prosecution** - Harold Lockhart and Glenda Lockhart allege under 42 U.S.C. § 1983 and the Fourth Amendment to the Constitution of the United States of America, that Tony Vest committed malicious prosecution by lying under oath at the plaintiffs' trials on October 18, 2011.

(Doc 29, Pl. 3rd Amended Compl., pp. 11-13).   The plaintiffs allege that each of the above actions was committed by all defendants without probable cause, with malice, with deliberate indifference, wilfully, and intentionally.   (Doc. 29, Pl. 3rd Amended Compl., p. 11).

A. *Qualified Immunity*

The plaintiffs' Third Amended Complaint asserts all claims against defendants Vest, Smith, Barnett, and Dutton for damages under 42 U.S.C. § 1983 for violation of the plaintiffs' constitutional rights.   (Pl. 3rd Amended Compl., p. 11).   The defendants assert qualified immunity as to all of the federal claims arising out of the events of July 29-30, 2011.   Section 1983 provides a right of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" when the deprivation is caused by anyone acting under color of state law.   Id.

16

Under federal law, it is long-settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights".   Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).   The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" carried out by means which the official has the authority to utilize.   Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).   Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield.   Harris v. Board of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).   To avoid qualified immunity, the plaintiff must show that the defendant was on "fair warning" that his conduct violated the constitutional rights of the plaintiff.   Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002) (citing United States v. Lanier, 520 U.S. 259, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997)). This "fair warning" may come either from factually similar case law or where "the right is one of ""obvious clarity""- i.e., where the officer's conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to

17

[the official], notwithstanding the lack of fact-specific case law' on point." Glenn v. City of Columbus, Ga., 375 F. App'x 928, 931-32 (11th Cir. 2010) (quoting Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir. 2009) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002))).   Reliance on similar case law requires case law that establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's place, that the actions violate federal law.   Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001).

The initial burden of demonstrating that the public official is acting within the scope of his position lies with the defendant asserting that defense.   Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003).   The test is not whether the defendant had the authority to effectuate an illegal act, but whether the defendant's job entailed engaging in the act generally.   Holloman, 370 F.3d at 1266.   In other words, the court does not ask whether the defendant had the right to *illegally* arrest the plaintiff, or to use excessive force against the plaintiff, but simply whether making arrests was within the general scope of the officer's duties.   The answer in this case, of course, is in the affirmative.

Once the defendant has met that burden, as the defendants in this case have, the burden shifts to the plaintiff to show that the defendants are not entitled to qualified immunity.   Id.   To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and

18

(2) this right was clearly established at the time of the alleged violation." <u>Id.</u>, citing <u>Wilson v. Layne</u>, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999). In <u>Saucier v. Katz</u>, the United States Supreme Court outlined a two-step process for determining when qualified immunity is inappropriate.   533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).   The process required the court first to ask whether "the facts alleged show the officer's conduct violated a constitutional right," and only then ask "whether the right was clearly established."   <u>Saucier</u>, 533 U.S. 194, at 201.   However, in <u>Pearson v. Callahan</u>, the Court reconsidered the <u>Saucier</u> method and determined that the sequence "should no longer be regarded as mandatory.   The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."   555 U.S. 223, 236, 129 S. Ct. 808 (2009).

In light of the facts in this case, the court will analyze the second prong first and determine whether a clearly established right existed before determining whether defendants violated the right.    If the court determines that a defendant has qualified immunity, the court need go no further in its analysis.   Therefore, the court will first evaluate each defendant's eligibility for qualified immunity in regards to each count.

*i. False Arrest*

Defendants Vest, Smith, Barnett, and Dutton claim to be entitled to qualified immunity for the alleged false arrest of Harold Lockhart.   Likewise, defendants Smith, Barnett, and Dutton (but not Vest) also contend they are entitled to qualified immunity for the alleged false arrest of Glenda Lockhart.   First, the defendants must illustrate that they were acting within the scope of their positions at the time of the alleged constitutional violation.   At the relevant time, all defendants were employees of the Morgan County Sheriff's Department (Vest, Smith, and Barnett were deputies, and Dutton was a sergeant) and were responding to a 911 call reporting shots fired.   It is well within the authority of deputies and sergeants of the sheriff's department to respond to and investigate emergency calls and, when necessary, effectuate arrests. Thus the acts here were within the scope of their discretionary authority as sheriff's deputies.

Therefore, the burden shifts to the plaintiffs to show that (1) the plaintiffs had a clearly established constitutional right, and (2) the defendants violated that right.   The plaintiffs did, at the time of the alleged violation, have a clearly established Fourth Amendment right to be free from arrest without probable cause.   The plaintiffs now must show that the defendants, while acting under color of law, violated that right. The plaintiffs argue that Smith violated Harold's right to be free from illegal seizure because no probable cause or arguable probable cause existed to arrest Harold.   As the

Eleventh Circuit Court of Appeals explained, law enforcement officials sometimes will "mistakenly conclude that probable cause" to make an arrest exists, but in those instances the officials still are shielded by qualified immunity.   Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990)(citing Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

An arrest without a warrant and lacking probable cause violates the constitution and can support a claim pursuant to 42 U.S.C. § 1983, but the existence of probable cause at the time of arrest is an absolute bar to such a claim.   Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010) (citing Case v. Eslinger, 555 F.3d 1317, 1326-27 (11th Cir. 2009); Kingsland v. City of Miami, 382 F.3d 1220, 1226, 1232 (11th Cir. 2004); Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996)).   The issue is whether there existed at the time of Harold's arrest "arguable" probable cause for the arrest.   See Von Stein, 904 F.2d at 579, and cases cited therein.   Actual probable cause need not be proved, but only "whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed."   Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003), cert. denied, 124 S. Ct. 128, 157 L. Ed. 2d 143 (2003).   "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." 323 F.3d at 878, quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991).

21

Taking the facts in the light most favorable to the nonmoving plaintiffs, when Harold informed Smith that he intended to go inside to call his attorney, and he took one or two steps toward the door, he was placed under arrest, purportedly for interference with governmental operations.   Harold testified that when he was standing on the porch with Glenda and Felicia he became irritated with the questions the police were asking, and he thought the investigation should be over.   (Harold Lockhart, Depo. at 68).   He stated: "This is ridiculous, it's gone on long enough. You folks need to leave.   I'm going to call an attorney." (Id.)   Harold took a step or two toward the front door of the home, at which point Smith placed him under arrest.   (Id. at 69-70).   Smith explained that Harold going into the house interfered with his investigation because Smith was concerned that Harold may "speak with other witnesses and coach them on what to say." (Chad Smith, Depo. at 56-57). Harold claimed that his arrest occurred "15 minutes, maybe 20" after the defendants spoke to Bailey and Lindsey inside and came out of the house.   (Lockhart, Depo. at 68).   At the time of Harold's arrest, Daniel and Jeff still were unaccounted-for. (Id. at 58).

Taking the facts in the light most favorable to the nonmoving plaintiffs, Glenda sat on the porch for an hour-and-a-half to two hours after Harold was arrested.   (Glenda Lockhart, Depo. at 110).   During this time she had two conversations with Barnett.   First, Glenda asked if she could go to the restroom, and

Barnett told her that "if [she] got up, if [she] even tried to get up, [she] would be arrested." (Id. at 108). Later, Barnett came back to Glenda and Felicia and asked, "who had the gun?" (Id. at 109). Glenda was talking to Felicia about the fireworks that were going off intermittently and, rather than answering Barnett, Glenda continued her conversation with Felicia. (Id.) At that point, Barnett "nudged the pallet [Felicia and Glenda were sitting on], and she said, 'you don't have to talk to me, but I'm just about to arrest you for a PI (public intoxication).'" (Id.) Daniel returned to the house while Glenda was sitting on the front porch, but Jeff still was in the woods, unaccounted-for. (Id. at 111). Glenda remained on the porch without moving after Harold was arrested and, "at some point, Deputy Vest came up to [her] and told [her] to stand up and put [her] hands in front of [her], that [she] was under arrest."[16] (Id. at 113).

To show a lack of arguable probable cause, the plaintiffs must show that no reasonable officer faced with a similar situation could have believed that Harold intended to obstruct or was obstructing a government operation as defined by Alabama Code § 13A-10-2.[17] According to the undisputed facts of the case, the

---

[16] Vest provides a very different series of facts leading to Glenda's arrest. For summary judgment purposes, the court is accepting the facts in the light most favorable to the nonmoving party.

[17] Ala. Code § 13A-10-2. **Obstructing governmental operations**. (a) A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he: (1) Intentionally obstructs, impairs or hinders the administration of law or other governmental function; or (2) Intentionally prevents a

defendants were summoned by an emergency call to the Lockharts' home on reports of shots fired.   At the time of Harold's arrest, the person who made the 911 call (Daniel Lockhart) was unaccounted-for, along with Jeff and Patrick, the alleged instigator of the incident.   The defendants still had not been able to determine exactly what transpired that evening and had not ascertained whether the missing parties were injured.   The defendants also did not know who fired the gun and why. In light of the totality of the circumstances, a reasonable officer could have believed that if Harold had the opportunity to talk to other witnesses, outside the supervision of the defendants, he may tell them what to say, making it difficult or even impossible to discover what lead up to the 911 call.

A charge under § 13A-10-2 requires probable cause to believe that the person arrested acted by "means of intimidation, physical force or interference or by any other independently unlawful act" with the intent to obstruct the administration of law.   In this case, Harold's one or two steps toward the door amounted to "arguable" probable cause on this element of the purported offense.   Although in the calm of hindsight it is clear that Harold did not use "intimidation," "physical force or interference," or another "independently unlawful act" to persuade witnesses not to speak to the officers, Deputy Smith's judgment that Harold's movement toward the door amounted to "intimidation" or "physical force or interference" was not

_____

public servant from performing a governmental function.

unreasonable under the circumstances that night.   Deputy Smith knew that Harold already had told the girls they did not have to speak to the deputies, so it was reasonable to believe he might do so again.   He responded to a 911 call about a shooting incident, and when he arrived at least two people were missing in the woods. The added physical element of Harold's taking a step or two toward the door, despite the officer's instruction not to move, could be believed by a reasonable officer to be "intimidation" or "physical force or interference."   If any reasonable officer under the circumstances could have believe that Harold was using "intimidation" or "physical force or interference" to go inside to speak to witnesses, at least arguable probable cause to arrest arose.   For purposes of summary judgment, therefore, arguable probable cause existed to arrest Harold, and Smith, the arresting-officer, is entitled to qualified immunity and summary judgment as to Harold Lockhart's claim against him for false arrest.

The court cannot determine whether arguable probable cause existed for the arrest of Glenda Lockhart by Vest because there still are disputes of fact regarding the circumstances surrounding her arrest.   The claim against Vest related to the arrest of Glenda remains for resolution at a later time.

The second issue in Harold and Glenda's claims for false arrest is whether any non-arresting-officers violated a clearly established constitutional right by failing to step in and prevent these allegedly unconstitutional arrests.   Again, without question

the plaintiffs had a clearly established constitutional right to be free from illegal search and seizure, including the right not be arrested without probable cause.  So, the plaintiffs must show that the clearly established right was violated.  The plaintiffs argue that because all of the defendants were personally involved in investigating the 911 call, they all are liable for any unconstitutional arrests, whether or not they assisted in the effectuation of the arrests.  The plaintiffs base the argument on <u>Byrd v. Clark</u>, which states that "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983."  783 F.2d 1002, 1007 (11th Cir. 1986).  The facts of the instant case, however, differ dramatically from the facts in <u>Byrd</u>.  In <u>Byrd</u>, the defendant stood idly by while a fellow officer used excessive force and beat the person being arrested.  <u>Id.</u>  The defendant officer was deemed liable for failing to intervene in clearly unconstitutional behavior.  It is worth noting first that this case is not an excessive force claim. There are no allegations that any defendant used excessive force in effectuating the arrest of either Harold or Glenda Lockhart.  Second, it is important to note that, in <u>Byrd</u>, the officer was liable not for failing to intervene in the arrest itself, but for failing to intervene when excessive force was used.  Whether an arrest is constitutional stands on a far different footing than whether the use of force to effect the arrest is constitutional.  Merely by observing how force is used to make an arrest,

a reasonable officer can judge whether it is unconstitutionally excessive and should be stopped.   That is not true of an arrest.   One officer making an arrest may have far more information establishing probable cause than nearby officers, so that it is unreasonable to impose of fellow officers the duty to second-guess the probable cause decisions made by an arresting officer.   It is reasonable for fellow officers to defer to the arresting officer in the assessment of whether probable cause to make the arrest exists.   For this reason, Byrd is not applicable to this case.

The Eleventh Circuit made clear in Ensley v. Soper that "for an officer to be liable for failing to stop *police brutality*, the officer must be 'in a position to intervene.'" 142 F.3d 1402, 1407 (11th Cir. 1998) (citing Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996), and Thompson v. Boggs, 33 F.3d 847, 857 (7th Cir. 1994)) (emphasis added).   The instant case concerns an alleged unlawful arrest, not police brutality or excessive force.   The Eleventh Circuit has stated that "[m]erely being present with the arresting-officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command *authorizing* the arrest action." Brown, 608 F.3d 724 at 737.   In Brown, the Eleventh Circuit determined that the district court did not err in granting qualified immunity to two officers who were on the scene but did not participate in the plaintiff's arrest and were not the arresting-officer's supervisors.   Id. at 736-37.   In the instant case, Smith arrested Harold, and Vest arrested Glenda.   At the relevant time, Smith, Harold, and Barnett

all were deputies at the Morgan County Sheriff's Office, and the plaintiffs have presented no evidence showing that any defendant other than the stated arresting-officer took part in effectuating either arrest.[18]

Dutton's rank as sergeant requires a different analysis than the standard used for determining liability of officers of equal rank.   At the relevant time, Dutton was a supervising officer to the three deputies.   Because Dutton was a supervisory officer, he could be held liable for failing to intervene in an unconstitutional arrest if the plaintiff can show that he was part of the chain of command authorizing the arrest action.   See Brown, 608 F.3d at 737.   The plaintiffs, however, do not claim that Dutton authorized, ordered, or in any way assisted the arresting-officers in effectuating the arrest.   There is no evidence that he even knew of the arrests until after they occurred.   The plaintiffs rely on the same argument they present for the other deputies − because Dutton was on the property investigating the same 911 call, he is equally liable.   This argument is not supported by relevant case law.

---

[18]   The plaintiffs' brief claims that Barnett took part in Glenda's arrest.   Glenda's own testimony, however, does not support that allegation.   Glenda's deposition states that only her arresting-officer, Vest, accompanied her through the house to retrieve her shoes and identification after the arrest (Glenda Lockhart, depo. at 113), and she does not claim that any other defendant took part in the arrest itself.   Further, the fact that, previously in the evening, Barnett had ordered Glenda to remain where she was does not illustrate that Barnett was involved in Glenda's actual arrest.

Because Smith had at least arguable probable cause to arrest Harold, and none of the non-arresting-officers had a duty to intervene in the arrests of either Harold or Glenda, the defendants' actions did not violate Harold and Glenda's clearly established rights.   Because no constitutional right was violated, arresting-officer Smith, and non-arresting-officers Vest, Barnett, and Dutton are entitled to qualified immunity in the false arrest claim of Harold Lockhart.   Also, non-arresting-officers Smith, Barnett, and Dutton are entitled to qualified immunity in the false arrest claim of Glenda Lockhart, even though disputes of fact preclude summary judgment for Vest, the arresting officer.   In sum, both Harold and Glenda's claims of false arrest are due to be dismissed on summary judgment as to all defendants, except the claim against Vest stemming from the arrest of Glenda Lockhart.

### ii.   *False Imprisonment*

A claim of false imprisonment under 42 U.S.C. § 1983 "must meet the elements of common law false imprisonment and establish that the imprisonment worked a violation of due process rights under the Fourteenth Amendment." Ortega v. Christian, 85 F.3d 1521, 1526 (11th Cir. 1996).   Alabama Code § 6-5-170 defines false imprisonment as "consist[ing] of the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty."   In order to present a valid false imprisonment claim under § 1983, there must be an absence of probable cause. The Eleventh Circuit has held that "[w]here a police officer lacks

probable cause to make an arrest, the arrestee has a claim under Section 1983 for false imprisonment based on a detention pursuant to that arrest." <u>Ortega</u>, 85 F.3d at 1526.

This court already has determined that, for summary judgment purposes, at least arguable probable cause existed for Harold's arrest and the non-arresting-officers cannot be held liable for failure to intervene.   Accordingly, defendants Smith, Vest, Barnett, and Dutton are entitled to qualified immunity and summary judgment in regard to the Harold Lockhart's claim of false imprisonment.   Also, Smith, Barnett, and Dutton also are entitled to qualified immunity and summary judgment in regard to Glenda Lockhart's claim of false imprisonment.   Because Vest did not move for summary judgment on the false imprisonment claim filed against him by Glenda Lockhart, that claim remains pending.

     *iii.*   *"Home Invasion"*

The plaintiffs claim that defendants illegally entered and illegally searched their home.   The plaintiffs combine these allegations in their Third Amended Complaint under the title of "Home Invasion."   The plaintiffs base their "home invasion" argument on two allegations.   First, the plaintiffs allege that the defendants' initial entry into their home was illegal.   Second, the plaintiffs allege that the defendants illegally remained in the home after consent was revoked and/or an unreasonable

amount of time had passed.   The court will address the plaintiffs' two allegations separately.

### a. Warrantless Entry

To the extent the plaintiffs argue that the initial *entry* was illegal, that claim must fail.   Warrantless entry into a person's home generally is prohibited by the Fourth Amendment, pursuant to the person's right to be free from illegal search and seizure. However, that general prohibition does not extend to situations where voluntary consent has been obtained from the individual whose property is being searched. Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797, 111 L. Ed. 148 (1990). Harold stated during his deposition that he gave defendants permission to enter his home to speak with Bailey and Lindsey.   (Harold Lockhart, Depo. at 55).   No dispute of material fact exists.   Although the defendants had no warrant, they were given permission to enter the home.   The defendants were acting under their discretionary function in investigating a 911 call, and no clearly established rights were violated by the defendants' conduct.   Therefore, Smith, Vest, Barnett, and Dutton are entitled to qualified immunity on Harold and Glenda's claim of illegal entry into the home.

The bulk of the plaintiffs' argument is not that defendants illegally entered the home, but that they remained on the property and in the home for an extended period of time and even after Harold told them, "This is ridiculous, it's gone on long enough.

You folks need to leave."   It is clearly established that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid," and "[t]he need to protect or preserve life ... is justification for what would be otherwise illegal absent an exigency or emergency."   Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413, 57 L. Ed. 2d 290 (1978).   It also is clearly established that such an entry or search must be "strictly circumscribed by the exigencies which justify its initiation," and, "once the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises."   United States v. Murphy, 516 F.3d 1117, 1121 (9th Cir. 2008) (citing Mincey, 437 U.S. at 393).

The plaintiffs argue there was "no exigency" at the Lockhart home.   (Doc. 66, p. 28).   The plaintiffs emphasize the fact that Daniel and Jeff were not *inside* the Lockhart home but, rather, in the woods, and that Patrick was at his own residence. They insist that, after defendants spoke to Bailey and Lindsey inside the house and the well-being check was performed, there was no reason for defendants to remain inside the Lockhart home.   According to the accepted facts, when the defendants returned to the porch after talking to Bailey and Lindsey and verifying their well-being, the gun that had been fired was missing, Daniel and Jeff still were in the woods, and no one had been able to contact Patrick.   Shortly after the defendants returned to the porch,

32

Harold brought them the gun in question.   However, there still were three people unaccounted-for.

Daniel returned to the home after Harold's arrest but before Glenda's.   He spent 45 to 50 minutes in the woods.   (Glenda Lockhart, Depo. at 110).   Harold testified that Glenda's arrest occurred at around 2:00 a.m.   (Harold Lockhart, Depo. at 90-91).   At the time of Glenda's arrest, an hour-and-a-half to two hours after Harold's arrest (Glenda Lockhart, depo. at 110), Jeff still was unaccounted-for, and officers had not yet made contact with Patrick.   When Glenda and Harold were in the police vehicle, Glenda saw officers go to Patrick's house and speak with Charlotte. (Id. at 150).   Subsequently, Glenda and Harold were taken to the Morgan County Jail, and Glenda stated that Smith, Barnett, Dutton, and several other officers remained at her home.   (Id. at 151).   At around 3:00 a.m., the officers asked the children to contact their parents to come and pick them up, and they left the house at around 3:40 a.m.   (Bailey Lockhart, Depo. at 66-7, 73).   Jeff was never located, and the officers spoke only to Charlotte, not to Patrick himself.

Based on the time-line provided in the various depositions from the plaintiffs and their grandchildren, it appears that once Daniel was located and officers spoke to Charlotte, the investigation concluded fairly rapidly.   Even after concluding the investigation, it was necessary for the officers to ensure that the minor children were in the care of their parents before leaving the residence.   The plaintiffs insist that

after defendants determined that Daniel and Jeff were not inside the house, there no longer existed an exigent circumstance and defendants had no reason to remain on the property.   However, even when the facts are taken in the light most favorable to the plaintiffs, the situation was not controlled even after the safety check was performed.   A 14-year-old boy was missing, a man was unaccounted-for, and Patrick, the person who allegedly initiated the night's events, could not be contacted.   The defendants had no way to know if the unaccounted-for individuals were injured, armed, or posed a threat.   The Eleventh Circuit has concluded previously that exigent circumstances exist justifying a warrantless entry of a home to investigation a 911 call involving reports of shooting.   See United States v. Holloway, 290 F.3d 1331, 1336 (11th Cir. 2002).   The situation fell within the realm of exigent circumstances, and once the most pressing circumstances were over - Patrick had been contacted through Charlotte, Daniel had been found, and the minors were in the care of adults - the defendants left the premises.   The plaintiffs have not asserted facts to the contrary.   The defendants appropriately remained around or in the home based on the exigent circumstances created by the danger of shooting, missing persons, and unsupervised children.   The plaintiffs' Fourth Amendment rights were not violated by the duration of the defendants' presence.

But even if the defendants remained at or in the home longer than was justified by the exigencies, a reasonable officer faced with the circumstances they faced could

34

have believed that remaining at the home until adults picked up the children was justified and not a violation of the plaintiffs' Fourth Amendment rights.   One of the leading Supreme Court decisions on qualified immunity arises from a warrantless search of a home under a belief that exigent circumstances justified the search.   The Court explained:

> The Court of Appeals specifically refused to consider the argument that it was not clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances.   The previous discussion should make clear that this refusal was erroneous.   It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable.   We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. See Malley, supra, 475 U.S., at 344–345, 106 S. Ct., at 1097–1098.   The same is true of their conclusions regarding exigent circumstances.

Anderson v. Creighton, 483 U.S. 635, 640-41, 107 S. Ct. 3034, 3039-40, 97 L. Ed. 2d 523 (1987).   When an officer mistakenly but reasonably believes the exigent circumstances justify a continued intrusion on a privacy interest, he is entitled to qualified immunity from liability.   See Bates v. Harvey, 518 F.3d 1233, 1249 (11th Cir. 2008).   Here, defendants reasonably believed that the exigent circumstances warranting their continued presence at the plaintiffs" home did not end until the

unsupervised children were picked up by their parents. The reasonable officers could not simply leave a fourteen year old boy and two younger girls at the plaintiffs' home without adult supervision, or at least the law was not so clearly developed as to fairly warn the officers that remaining at the plaintiffs' home until adults picked up the children was an unconstitutional infringement of the plaintiffs' Fourth Amendment rights. Accordingly, Smith, Vest, Barnett, and Dutton, are entitled to qualified immunity as to the claim of illegal entry of the Lockharts' home, and their motions for summary judgment are due to be granted.

### b. *Warrantless Search*

The plaintiffs' allegation of a warrantless search of their home rests on two distinct points. First, the plaintiffs' brief alleges that the Lockharts did not consent to a "protective sweep" of the home. Secondly, the Lockharts allege that a warrantless investigative search of the home was performed after their arrests. The protective sweep occurred after Vest and Smith spoke with Bailey and Lindsey inside the home. (Harold Lockhart, Depo. at 104). The defendants "looked around the house, looked in the house, checked the girls, and then [the defendants and Harold] all went back outside." (Id.) Bailey testified that an officer did not go upstairs with them after the interview. (Bailey Lockhart, Depo. at 40).

In regards to an initial protective sweep, the Supreme Court has acknowledged that, although warrantless search of a home generally is unreasonable under the

Fourth Amendment, an exception exists such that "a protective sweep may be undertaken lawfully pursuant to an in-house arrest where the officer 'possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" United States v. Legette, 260 Fed. Appx. 247, 249 (11th Cir. 2008) (quoting Maryland v. Buie, 494 U.S. 325, 337, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990)).   Although the facts in this case are not completely consistent with those in Buie and Legette (this protective sweep was not undertaken pursuant to an in-house arrest), the Eleventh Circuit has stated that "[m]ost courts reviewing this issue have expanded Buie beyond in-home arrests ... to all situations wherein officers are lawfully present in a home."   Legette, 260 Fed. Appx. at 249-250; see also United States v. Miller, 430 F.3d 93, 99 (2d Cir. 2005) (agreeing with the First, Seventh, Fifth, Sixth, one panel of the Ninth, and the D.C. Circuits that protective searches may be undertaken even without an arrest warrant); but see United States v. Torres-Castro, 470 F.3d 992, 997 (10th Cir. 2006) (noting that itself, the Eighth Circuit, and one panel of the Ninth Circuit were the only circuits to limit Buie to situations where an arrest warrant is being executed).   The United States District Court of the Southern District of Alabama has specifically read Legette to extend the Buie "protective sweep doctrine" to circumstances where there is no arrest. U.S. v. Noriega, 2010 WL 34850, (S.D. Ala., January 22, 2010).

Based on applicable Eleventh Circuit law, this court will extend the <u>Buie</u> doctrine to the instant case, even though the protective sweep was not pursuant to an arrest.   The <u>Buie</u> doctrine asks whether the officers possessed a reasonable belief, based on specific and articulable facts, that the area to be swept (the Lockhart home) harbored an individual posing a danger to those on the scene.   The facts, taken in the light most beneficial to the nonmoving plaintiffs, indicate that, at the time the defendants entered the house, they were aware that a 911 call claiming shots fired had been received, the person who began the altercation resulting in the call was not present,[19] a 14-year-old boy had gone into the woods and had not yet been found, and possibly that an adult male had gone into the woods and had not yet been found. The defendants had begun searching the woodline for Daniel, and possibly Jeff, prior to speaking with Bailey and Lindsey inside the home.   (Glenda Lockhart, Depo. at 78-79, 82).

Based on the facts above, the defendants certainly had reason to believe that the Lockhart home may harbor an individual posing a danger to those on the scene. The defendants were at the home based on a "shots fired" 911 call.   They had not secured the weapon in question and had not assessed who fired the shots or how many weapons were on the property.   Three people were missing who could have

---

[19]   When Harold met the defendants at the gate, he told them that Patrick had gone to bed. (Harold Lockhart, Depo. at 50).

re-entered the home through the back door or could have hidden in the house rather than going to the woods.   The defendants did not know whether the unaccounted-for people were armed, injured, or posed a threat to themselves or others.   Accordingly, it was reasonable, to ensure the safety of the defendants, the two minors in the house, and everyone outside, for defendants to perform a protective sweep to be sure that no unaccounted-for persons remained in the home. The defendants' protective sweep was reasonable under Buie, as extended by this circuit.   The plaintiffs' Fourth Amendment rights were not violated, and Vest, Smith, Barnett, and Dutton are entitled to qualified immunity in regards to any claim of unlawful searching arising from the initial protective sweep.

The plaintiffs further allege that the defendants performed a warrantless investigative search of the home beyond the initial protective sweep.   Harold testified that after his arrest, as he sat in the patrol car for approximately two hours, he witnesses officers going in and out of his home, lights being turned on and off in rooms in the home, and seeing the silhouettes of large persons (presumably officers, as only children remained in the home) going by windows in the house.   In their respective motions for summary judgment, the defendants claim that there is no evidence upon which a reasonable jury could find for the plaintiffs.   A main component of this argument is the fact that the plaintiffs testified in depositions that anywhere from 6 to 10 deputies were present at their home on the night in question

(Glenda Lockhart, Depo. at 72, 94; Harold Lockhart, Depo. at 87), and thus it is not possible to say that *these* named defendants were the officers Harold saw in the house. The plaintiffs' brief, however, uses defendants' testimony and dispatch recordings to argue, instead, that the defendants "were the only officers there," so, any search done must have been done by one or all of the defendants.

The law is clear that "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*. [The court's] duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided." Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005) (Carnes, J., concurring). The plaintiffs may not testify to one version of the facts, but rely on another for purposes of creating a dispute of fact. The court must take the non-moving plaintiffs' version of the facts. Accordingly, despite what the plaintiffs contend in their brief, this court must operate on the testimony that there were anywhere from 6 to 10 deputies at the Lockhart residence on the night in question.

The defendants' primary argument to this allegation is not one of qualified immunity. Although the defendants argue that they are entitled to qualified immunity in regard to the plaintiffs' "Home Invasion" claim, the defendants' qualified immunity argument does not speak to the performance of an investigative search.

40

The defendants argue that they are entitled to qualified immunity on the plaintiffs' "Home Invasion" claim because: 1) the defendants were called to the scene due to a 911 emergency call and were then given permission to enter the property and the residence, 2) once the defendants had lawful consent to enter the residence, the defendants had the right to conduct a protective sweep, and 3) the officers faced exigent circumstances throughout the investigation, entitling them to remain at the plaintiffs' residence until the exigencies subsided.   These three points, although relevant to the other elements in the plaintiffs' "Home Invasion" claim, do not address the allegation that the defendants performed an investigative search beyond the protective sweep.   The bulk of the defendants' argument responding to the plaintiffs' allegation regarding the investigative search stems not from the idea that the officers were protected by qualified immunity, but from the argument that the plaintiffs have not provided enough evidence to support the claim.

The defendants argue in their respective briefs that the plaintiffs simply have not produced enough evidence that a search actually occurred for a reasonable jury to rule in their favor.   In regards to a search other than the initial protective sweep, the plaintiffs and their grandchildren discuss their evidence in depositions.   After Harold's arrest, while he was in the patrol car, Harold saw officer activity on the property that included officers going in and out of the house several times, lights going on and off in the guest bedroom, upstairs, and in the garage.   (Harold

41

Lockhart, Depo. at 76, 77, 90).   He could see someone moving inside the house through a large living room window, and the person was larger than either Bailey or Lindsey.   (Id. at 76).   When Harold saw this person, Glenda and Felicia still were on the front porch, within Harold's line of sight.   (Id. at 77).   He was unable to identify the people he saw moving in his living room or turning lights off and on, but assumed it was one of the four defendants.   (Id.)   He saw all four of the defendants go into and out of his home while he was sitting in the patrol car.   (Id. at 89). However, Harold cannot say what the defendants were doing inside the house.   (Id. at 90).

Upon his return from the woods, Daniel Lockhart saw officers walking in and out of the home talking to each other, and walking around the house.   (Daniel Lockhart, Depo. at 76-79).   He believes an officer was upstairs with Bailey, Lindsey, and Felicia.   (Id.)   He also saw an officer "standing by" inside the home when he returned.   (Id. at 67-68).   Daniel overheard officers "walking around all over the house," and heard a drawer open a couple of times.   (Id. at 74, 77).   He claimed someone other than Harold, Glenda, or Bailey walked into his room.   (Id. at 76).

While Glenda was on the porch, after Harold's arrest, she saw around eight deputies going into and out of her home and walking around the house.   (Glenda Lockhart, Depo., pp. 108-109).   She could not remember whether the four defendants were in that group.   (Id. at 109).   When Glenda was outside she saw

officers going through the yard with flashlights looking at the tree line and saw the lights go on in her bedroom.   (<u>Id.</u> at 149).   She stated that her "entire house was searched." (<u>Id.</u> at 155).   After her arrest, when Vest walked her through the house to retrieve her shoes and identification, Glenda saw an officer looking in and behind books and opening the cabinet doors on the bookcase in the living room.   (<u>Id.</u> at 114). However, she stated that the officer she saw was not one of the four defendants. (<u>Id.</u>)

Bailey Lockhart testified that after she returned downstairs, she saw about six deputies inside the home looking around.   (Bailey Lockhart, Depo. at 45).   They were searching through the books and shelves in the library.   Then officers went upstairs, into the Lockharts' bedroom, the guest bedroom, and the bathroom.   (<u>Id.</u> at 45-48). Bailey did not specifically identify any deputies in her deposition.   (<u>Id.</u>)   She heard drawers and cabinets opening in the Lockharts' bedroom, specifically the drawers to her grandfather's desk, and storage baskets being moved in the bathroom.[20]   (<u>Id.</u> at 48-49). Bailey heard the closet door opening in the guest bedroom and people walking around upstairs.   (<u>Id.</u> at 49).   In her deposition, Bailey stated that she believed she saw some of the defendants searching, but was not certain, and Bailey stated that there were no female officers in the house.   (<u>Id.</u>)

---

[20]   Bailey knew by sound the particular drawers being opened and that the baskets in the bathroom were being moved because those furniture items make a distinctive sound when they are moved.   (Bailey Lockhart, Depo., pp. 48-49.)

Upon returning home, at around 8:15 a.m., the Lockharts took pictures of their home to document evidence of the alleged search.   The pictures show open drawers in the upstairs "game room," papers and pictures moved around and drawers opened on Harold's desk in the library, opened drawers on Glenda's nightstand, open drawers and cabinets in the bathroom, open drawers on Glenda's vanity, storage baskets pulled out, Glenda's open jewelry box, baskets pulled out in the Lockharts' closet, clothes moved in the closet, and some of Glenda's underwear on the floor.   (Glenda Lockhart, Depo. at 125-144.)[21]   These photographs depict the upstairs gameroom with drawers open, which Glenda Lockhart claimed none of her family did.   (Id. at 128-129).   Glenda said the basis of her belief was that her grandchildren told her they heard cabinets and drawers opening upstairs, and heard officers walking around upstairs and that Bailey told Glenda that Smith opened the drawers on Harold's desk.   (Id. at 129-131).   Glenda stated at her deposition that she believes one or any combination of the defendants opened the drawers of her nightstand.   (Id. at 132-133).   Glenda based this belief, also, on what her grandchildren told her.   (Id. at 133).

In their respective motions, the defendants argue that there simply is no evidence that any of the defendants did anything other than the protective sweep.   The argument relies heavily on the claim that, because the plaintiffs testify that there were

---

[21]   Oddly, neither party has offered the photographs as exhibits to their summary judgment briefs.   While it appears from Glenda Lockhart's deposition that she was examined extensively about them, they are not attached as exhibits to her deposition filed with the court, or are otherwise in the record.

more officers than the four defendants present at their home, they cannot prove that any of *these* defendants specifically was involved in any search.  The defendants also argue that, because the plaintiffs did not personally witness a search take place, they cannot provide sufficient evidence of a search for a reasonable jury to find in their favor.  However, as indicated by the summation of facts and testimony provided above, the plaintiffs can, in fact, produce evidence that their home was searched.  The defendants, as the moving party, have not met the burden of illustrating that there is either no genuine dispute of material fact, or that the plaintiffs have failed to present evidence in support of their claim.  The circumstantial evidence of the presence of the four defendants, the movement seen inside the plaintiff's house, the sounds of searching heard by the plaintiff's grandchildren, and signs of a search discovered when the plaintiffs returned home is enough to allow a jury to determine the truth about the defendants' involvement.[22]

It is not the function of this court to weigh evidence and determine the truth of the matter. This court solely must find whether there is sufficient evidence that a reasonable jury could find in favor of the plaintiffs.  In this case, the plaintiffs have presented enough evidence that a reasonable jury conceivably could find in their favor.  Accordingly, the defendants are not entitled to summary judgment on the plaintiffs'

---

[22]   As noted, the defendants do not assert qualified immunity on this claim, and it is unlikely they could argue that they were not fairly warned by the law that conducting an investigative search of a private home – opening drawers and closets, looking through books and on shelves -- without a warrant was an unconstitutional invasion of the plaintiff's Fourth Amendment privacy rights.

claims of an unconstitutional investigative search.  So far as the plaintiffs' claim for home invasion is based on an unconstitutional, investigative search of the Lockhart home, defendants Vest, Smith, Barnett, and Dutton's motions for summary judgment are due to be denied.

### iv.  Malicious Prosecution

The plaintiffs allege that defendant Vest engaged in malicious prosecution, violating their rights under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution, because he willfully, intentionally, maliciously, and with deliberate indifference lied under oath on October 18, 2011.  Vest claimed that he is entitled to qualified immunity regarding his testimony because probable cause or arguable probable cause existed to arrest Harold.

Discussing a malicious prosecution claim pursuant to § 1983 requires an analysis of both federal and state law.  The Eleventh Circuit Court of Appeals has provided guidance on evaluating claims of malicious prosecution brought pursuant to § 1983:

> To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures *in addition to* the elements of the common law tort of malicious prosecution. *See Uboh*, 141 F.3d at 1002-04; *Whiting*, 85 F.3d at 584-86; *Kelly*, 21 F.3d at 1553-55.  As to the constituent elements of the common law tort of malicious prosecution, this Court has looked to both federal and state law and determined how those elements have historically developed. *Uboh*, 141 F.3d at 1002-04; *Whiting*, 85 F.3d at 584-86. For example, in *Uboh*, this Court examined both federal law and Georgia law and indicated that, for purposes of a

§ 1983 malicious prosecution claim, the constituent elements of the
common law tort of malicious prosecution included: (1) a criminal
prosecution instituted or continued by the present defendant; (2) with
malice and without probable cause; (3) that terminated in the plaintiff
accused's favor; and (4) caused damage to the plaintiff accused. 141 F.3d
at 1004.   We note that these are also the same elements required under
Alabama law for the tort of malicious prosecution. *Delchamps, Inc. v.
Bryant*, 738 So. 2d 824, 831-32 (Ala. 1999).

Wood v. Kesler, 323 F.3d 872, 881-82 (11th Cir. 2003)(footnotes omitted)(emphasis

added), *cert. denied*, 540 U.S. 879 (2003).

The torts of false arrest and malicious prosecution do not overlap in time,

according to the Eleventh Circuit Court of Appeals.   In Kingsland v. City of Miami,

the court explained that a false arrest § 1983 claim may be predicated upon the arrest

that precedes the institution of a prosecution, but that a malicious prosecution § 1983

claim requires a post-arraignment seizure that violates the constitution and may not be

predicated on the pre-arraignment seizure.   382 F.3d 1220, 1235-36 (11th Cir. 2004).

Although Justice Ginsburg set forth in a concurrence her opinion that a "continuing

seizure" may occur where a defendant is forced to appear in court or pay a bond,

Albright v. Oliver, 510 U.S. 266, 276-79, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994), that

concept was not adopted by the other justices, and has since been rejected by the

Eleventh Circuit Court of Appeals and by other circuits.   See, Whiting, 85 F.3d at

584; Reed v. City of Chicago, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996); Nieves v.

47

McSweeney, 241 F.3d 46, 56-57 (1st Cir. 2001).   The Eleventh Circuit Court of

Appeals has explained:

> Next, Kingsland bears the burden of proving that she was seized in
> relation to the prosecution, in violation of her constitutional rights.   In
> the case of a warrantless arrest, the judicial proceeding does not begin
> until the party is arraigned or indicted.   *See, e.g., Mejia v. City of New York*,
> 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) ("[T]he existence, or lack, of
> probable cause is measured as of the time the judicial proceeding is
> commenced (e.g., the time of the arraignment), not the time of the
> preceding warrantless arrest.").   Thus, the plaintiff's arrest cannot serve
> as the predicate deprivation of liberty because it occurred prior to the
> time of arraignment, and was "not one that arose from malicious
> prosecution as opposed to false arrest." *Id.* at 254 n. 26.

Kingsland v. City of Miami, 382 F.3d 1220, 1235 (11th Cir. 2004).

In the instant case, the plaintiffs base their claim for malicious prosecution on

two alleged infractions.   First the plaintiffs cite the initial, allegedly unlawful, arrests,

and second, they claim that Vest "lied on the witness stand" at the plaintiffs' trial.

The arrests themselves were pre-arraignment seizures that cannot, on their own,

support a malicious prosecution claim brought under § 1983.   Kingsland, 382 F.3d at

1235-36.   Accordingly, the plaintiffs' § 1983 malicious prosecution claim is supported

only by the plaintiffs' allegation that Vest committed perjury.   For purposes of a

§ 1983 malicious prosecution claim, perjury does not constitute a "seizure" that violates

Fourth Amendment rights.   First, a testifying witness has absolute immunity from

liability for his testimony, even where perjurious.   See Briscoe v. LaHue, 460 U.S. 325,

326, 103 S. Ct. 1108, 1111–12, 75 L.Ed.2d 96 (1983); Rehberg v. Paulk, 611 F.3d 828, 839 (11th Cir. 2010) aff'd, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (U.S. 2012).   Second, Vest's testimony resulted in no deprivation of physical liberty; the plaintiffs were not arrested or seized as a result of the testimony.[23]   The plaintiffs' claim does not meet the first prong required to establish a federal malicious prosecution claim under § 1983, which is proving a violation of the plaintiffs' Fourth Amendment right to be free from unreasonable seizures.   Therefore, the court need not determine whether the plaintiffs' claim meets the second prong – the elements of common law tort for malicious prosecution.

Accordingly Vest's motion for summary judgment as to the plaintiffs' claim for malicious prosecution is due to be granted.

## RECOMMENDATION

Based on the foregoing undisputed facts and legal conclusions, the court hereby RECOMMENDS that the motions for summary judgment (docs. 48, 50, 52, 54) filed by the defendants be GRANTED as to the following:

1.   Harold Lockhart's claims of false arrest and false imprisonment against Smith, Vest, Barnett, and Dutton.

---

[23]   In contrast, an officer giving perjurious testimony to obtain an arrest warrant serves both to commence a judicial proceeding with the filing of a complaint and to cause the seizure of the defendant. See Carter v. Gore, 2014 WL 783151 (11th Cir. Feb. 28, 2014).   The instant case did not involve an arrest pursuant to a warrant.

2.   Glenda Lockhart's claims of false arrest and false imprisonment against Smith, Barnett, and Dutton (but not as to Vest).

3.   Harold and Glenda Lockhart's claims of illegal entry (described by the plaintiffs, along with warrantless search, as "home invasion") against Vest, Smith, Barnett, and Dutton.

4.   Harold and Glenda Lockhart's claims of malicious prosecution against Vest.

The court further RECOMMENDS that the motions for summary judgment filed by the defendants be DENIED as to Harold and Glenda Lockhart's claim of warrantless investigative search (described by the plaintiffs, along with illegal entry, as "home invasion") against Vest (doc. 48), Smith (doc. 50), Barnett (doc. 52), and Dutton (doc. 54).

## NOTICE OF RIGHT TO OBJECT

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court.  **Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.**   Failure to do so will bar any later challenge or review of the factual findings **or legal conclusions** of the magistrate judge.   See 28 U.S.C. ʗ 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985), rehʗg denied, 474 U.S. 1111, 106 S. Ct. 899, 88 L. Ed.2d 933 (1986); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982) (en banc).   In order to

challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.   A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge.   The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record.   The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.   Appeals may be made only from a final judgment entered by or at the direction of a district judge.

Done this 14th day of May, 2014.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE